## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| NEWMARKET CORPORATION, a Virginia Corporation, and AFTON CHEMICAL CORPORATION, a Delaware Corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:10cv503 |
| INNOSPEC INC., a Delaware Corporation, and ALCOR CHEMIE VERTRIEBS GmbH, a Swiss Corporation, | ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

JUL 23 2010
CLERK, U.S.
RICHMOND

## COMPLAINT

Plaintiffs, NewMarket Corporation ("NewMarket") and Afton Chemical Corporation ("Afton"), by counsel, state the following as their Complaint against Defendants, Innospec Inc. ("Innospec") and Alcor Chemie Vertriebs GmbH (also known as Alcor Chemie Vertriebs AG) ("Alcor"):

## PRELIMINARY STATEMENT

1.     This case arises from Innospec's guilty pleas in which it admitted violations of the Foreign Corrupt Practices Act by bribing government officials in Iraq and Indonesia to ensure ongoing sales in those countries of tetraethyl lead ("TEL"), Defendants' lead based anti-knock fuel additive, to the detriment of Plaintiffs and their sale of a competing and alternative non-lead based fuel additive, methylcyclopentadienyl manganese tricarbonyl ("$mmt$®").[1]  The trade and interstate commerce relevant to this action are the sale and supply of TEL and $mmt$®.

---

[1] MMT® and $mmt$® are registered trademarks of Afton Chemical Corporation.

2.      TEL is a lead based anti-knock fuel additive used to raise the level of octane during the production of leaded gasoline and some types of aviation fuel.  TEL is sometimes referred to as a sunset product because of its very limited future.  Worldwide use of TEL has declined since 1973 following enactment of the Clean Air Act of 1970 and similar legislation in other countries.  By 2000, the use of TEL in motor gasoline had essentially ceased in the United States and Europe following their transition to unleaded gasoline.  TEL in motor gasoline is now used only in a few countries in the Middle East, Asia and North Africa where refining capacity and technology for unleaded gasoline is not as fully developed.

3.      Innospec, through its various subsidiaries and operating companies, manufactures, sells and supplies TEL.  On information and belief, Innospec is one of the only manufacturers of TEL in the world.  Innospec also manufactures non-lead based fuel additives, including ferrocene (also marketed as "plutocene"), a non-lead based fuel additive used to raise the level of octane during the production of unleaded gasoline.

4.      In or around 1999, Innospec purchased OBO Adler Company Ltd., including its Swiss subsidiary, Alcor.  Alcor operated a TEL manufacturing facility located in Döberitz, Germany until that facility was closed in or around 2002.

5.      During all or part of the period in which the events described in this Complaint occurred, Innospec and Alcor sold and supplied substantial amounts of TEL in a continuous and uninterrupted flow of, and which had a substantial effect on, interstate and foreign commerce. Alcor's relevant activities were overseen and controlled by Innospec.

6.      TEL has been a very profitable product for Innospec and Alcor, and is or was a major source of their income.  Innospec and Alcor have enjoyed a dominant market position in TEL production and sales.

2

7.    *mmt®* is a non-lead based fuel additive used to raise the level of octane in unleaded gasoline. As more countries have transitioned to unleaded gasoline—and there has been growing pressure over time to do so because of environmental and health concerns—Innospec and Alcor have faced competitive pressure as new opportunities have been created for non-lead based fuel additives (octane boosters), principally *mmt®* sold by Plaintiffs.

8.    From at least 2000 and continuing through at least 2008, Innospec and Alcor paid and promised payment of illegal bribes and kickbacks to Iraqi officials to obtain and maintain lucrative TEL sales, and to ensure that the government of Iraq and/or relevant officials and entities favored TEL over *mmt®*.

9.    From at least 2000 and continuing through at least 2006, Innospec paid and promised payment of illegal bribes and kickbacks to Indonesian officials to obtain and maintain lucrative TEL sales, and to ensure that the government of Indonesia and/or relevant officials and entities favored TEL over *mmt®*.

10.    Innospec has admitted to the conduct (including that of Alcor) described in this Complaint, has pleaded guilty to such conduct in U.S. and U.K. courts, and has been sentenced in connection with such conduct. Copies of the Plea Agreement between Innospec and the U.S. Department of Justice ("DOJ") and related criminal Information filed in the U.S. District Court for the District of Columbia are attached as Exhibits A and B, respectively, and the information and allegations contained therein are incorporated by reference. A copy of the civil Complaint filed in the U.S. District Court for the District of Columbia by the U.S. Securities and Exchange Commission ("SEC") as part of its settled enforcement action against Innospec is attached as Exhibit C, and the information and allegations contained therein are incorporated by reference. A copy of the Opening Statement filed in the U.K. Southwark Crown Court by the U.K. Serious

3

Fraud Office ("SFO") as part of its settled enforcement action against Innospec is attached as

Exhibit D, and the information and allegations contained therein are incorporated by reference.

## PARTIES

11.     Plaintiff NewMarket Corporation is a corporation organized and existing under

the laws of the Commonwealth of Virginia with its principal place of business in Richmond,

Virginia. NewMarket is a global corporation—and the parent of various subsidiaries which it

oversees and controls—that develops, manufactures and sells chemical additives that among

other things enhance the performance of petroleum products. NewMarket was organized as a

holding company on or around July 1, 2004. Ethyl Corporation was the predecessor to

NewMarket and became a wholly-owned subsidiary of NewMarket in or around July 2004.

12.     Plaintiff Afton Chemical Corporation, a wholly-owned subsidiary of NewMarket,

is incorporated in the State of Delaware and headquartered in Richmond, Virginia. Afton was

formerly known as Ethyl Petroleum Additives, Inc. until it changed its name on or around July 1,

2004. Afton manufactures, sells and supplies *mmt*®.

13.     Defendant Innospec, Inc. is a corporation organized and existing under the laws of

the State of Delaware with its executive offices in the United Kingdom. Innospec is a global

corporation—and the parent of various subsidiaries which it oversees and controls—that

manufactures and sells, among other things, fuel and power-related chemicals such as gasoline

additives, including TEL. Innospec, which was known as Octel Corporation until it changed its

name on January 30, 2006, is one of the only manufacturers of TEL in the world.

14.     Defendant Alcor Chemie Vertriebs GmbH, a wholly owned subsidiary of

Innospec, is incorporated in Switzerland and headquartered in Zug, Switzerland. Throughout the

relevant period, Alcor acted as an agent of, and its conduct was overseen, directed, authorized,

4

approved and controlled by, Innospec Inc. Alcor sells and supplies TEL, and formerly manufactured TEL.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under federal law pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Innospec and Alcor under 15 U.S.C. §§ 15 and 22, Virginia Code § 8.01-328.1, and Federal Rule of Civil Procedure 4(k).

17.     Innospec and Alcor have regularly transacted business in the Commonwealth of Virginia and have contracted to supply services or things in the Commonwealth of Virginia.

18.     Innospec and Alcor have caused Plaintiffs tortious injury in the Commonwealth of Virginia by one or more acts committed outside the Commonwealth of Virginia, and Innospec and Alcor have regularly solicited business, and/or engaged in a persistent course of conduct, and/or derived substantial revenue from goods used or consumed or services rendered, in the Commonwealth of Virginia as contemplated by Virginia Code § 8.01-328.1.

19.     Between 1993 and 2001, Innospec entered into at least six separate marketing and sales agreements with Ethyl and/or its subsidiaries, which have their principal place of business in Richmond, Virginia. These agreements were negotiated with Innospec and entered into by Ethyl in Richmond, Virginia.

20.     On or around January 1, 1998, Innospec and Ethyl entered into a "Supply of Lead Antiknock Compounds Agreement" relating to the resale of TEL in the United States. The initial term of this agreement was five years, with a provision that it would continue for as long as Innospec manufactures or supplies TEL.

21. On or around October 1, 1998, Innospec and Ethyl entered into an "Antiknock Marketing and Sales Agreement" relating to the marketing and sale of TEL in most markets outside the United States and Europe. The initial term of this agreement was twelve years. The agreement specified that it was to be "governed by, construed and enforced in accordance with the laws of the Commonwealth of Virginia."

22. Alcor has entered into at least two separate marketing and sales agreements with Ethyl and/or its subsidiaries, which have their principal place of business in Richmond, Virginia. These agreements were negotiated with Alcor (and Innospec) and entered into by Ethyl in Richmond, Virginia.

23. On or around January 1, 2000, Alcor entered into an "AK [Antiknock] Product Marketing and Sales Agreement" with Ethyl relating to the marketing and sale of TEL in certain markets outside the United States and Europe. The initial term of this agreement was twelve years. The agreement also recites that it "shall be governed by, construed and enforced in accordance with the law of the Commonwealth of Virginia."

24. On or around June 13, 2001, Alcor entered into an "Amended and Restated AK [Antiknock] Product Marketing and Sales Agreement" with Ethyl relating to the marketing and sale of TEL in certain markets outside the United States and Europe. The initial term of this agreement was eleven years. The agreement also recites that it "shall be governed by, construed and enforced in accordance with the law of the Commonwealth of Virginia."

25. From 2006 to 2009, Innospec sold and supplied in excess of $24 million dollars of TEL to Ethyl for resale by Ethyl in the United States only.

26. Payment for the TEL sold and supplied by Innospec to Ethyl was made during all relevant times by wire transfer initiated from Richmond, Virginia.

6

27.     Purchase orders for the TEL sold and supplied by Innospec to Ethyl were created in and transmitted from Richmond, Virginia.

28.     Innospec representatives traveled to Richmond, Virginia in October 2009 to solicit Afton's business for the supply of fuel additives. On or around October 6, 2009, representatives of Innospec and Afton met in Richmond, Virginia to review their existing business activities and discuss opportunities to expand sales between the companies. The meeting was held at Innospec's request in order to re-establish ongoing dialogue on potential supply opportunities.

29.     In addition to its large of volume of annual sales to Ethyl and Afton, Innospec has sold and supplied a substantial volume of its products into Virginia during each of the last five years. On information and belief, Innospec has sold and supplied on average $1 million of its products to various customers in Virginia each year from at least 2005 through at least 2009.

30.     On information and belief, Innospec has made substantial sales in the last five years to customers located in Virginia, including Estes Express Lines; Sunoco, Inc.; Hess Corporation; TransMontaigne Inc.; and the U.S. Department of Defense, Defense Logistics Agency's DLA Aviation based at Defense Supply Center Richmond.

31.     Throughout the relevant period, Innospec authorized, directed and approved the activities of Alcor and of their mutual agent, Ousama M. Naaman ("Naaman"), in paying and promising payment of illegal bribes and kickbacks to Iraqi officials to facilitate the sale and supply of TEL, and to block Plaintiffs' sale and supply of *mmt®* in Iraq, thereby causing Plaintiffs tortious injury within the Commonwealth of Virginia. In some instances, Innospec authorized and directed Naaman's activities directly through its officers and a Managing Director. On other occasions, Innospec authorized and directed Naaman's activities through

7

employees of Alcor. Innospec also directly participated and engaged in the bribery of Iraqi officials. Alcor was Innospec's principal operating entity in Iraq.

32.     Throughout the relevant period, Alcor paid and promised payment of—and authorized, directed and approved the activities of its agent, Naaman, in paying and promising payment of—illegal bribes and kickbacks to Iraqi officials to facilitate the sale and supply of TEL, and to block Plaintiffs' sale and supply of *mmt®* in Iraq, thereby causing Plaintiffs tortious injury within the Commonwealth of Virginia.

33.     Throughout the relevant period, Innospec authorized, directed and approved the activities of its agent, a company named PT Soegih Interjaya ("PTSI"), in paying and promising payment of illegal bribes and kickbacks to Indonesian officials to facilitate the sale and supply of TEL, and to block Plaintiffs' sale and supply of *mmt®* in Indonesia, thereby causing Plaintiffs tortious injury within the Commonwealth of Virginia. Innospec authorized and directed PTSI's activities through its officers and senior executives. Innospec also directly participated and engaged in the bribery of Indonesian officials. PTSI was Innospec's principal agent in Indonesia.

34.     Venue is proper in this District pursuant to 15 U.S.C. §15 and 28 U.S.C. §§1391(b) and (c).

## FACTUAL ALLEGATIONS

### The United Nations Oil-For-Food Program

35.     The Oil-for-Food Program ("OFFP")—established by the United Nations in 1995 under U.N. Security Council Resolution 986—was instituted to mitigate the impact on Iraqi citizens of international economic sanctions aimed at the demilitarization of Iraq following the first Gulf War. The OFFP, which started in December 1996, permitted Iraq to sell oil on the

world market in exchange for food, medicine and other humanitarian needs. The OFFP was terminated in November 2003 after the United States invaded Iraq.

36.     The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). This account funded purchases of humanitarian goods by the government of Iraq, including its purchases of TEL from Innospec.

37.     Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the government of Iraq to sell goods to the government of Iraq. Once that contract was finalized, it was reviewed by a U.N. Committee to ensure that their terms complied with all OFFP and Iraqi sanction regulations.

38.     If a contract was approved by the U.N. Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

39.     Beginning in approximately August 2000, the government of Iraq demanded that suppliers pay a kickback, usually valued at ten percent (10%) of the contract price, in order to be awarded an OFFP contract. These kickbacks violated OFFP regulations and U.N. sanctions which prohibited payments to the government of Iraq which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

40.     From 2001 through 2004, Innospec, through Alcor, participated in the OFFP. On information and belief, Innospec, through Alcor, paid or promised to pay kickbacks to the

government of Iraq in excess of $1.8 million and earned profits in excess of $23 million on these sales.

41.     Innospec has admitted that a number of its senior executives, including its then-Chief Executive Officer, were aware of and approved the kickback payments.

42.     On information and belief, these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. These ASSFs were included in the contract price submitted by Alcor to the U.N. without disclosing to the U.N. the fact that the contract contained an extra ten percent (10%) which would be kicked back to the government of Iraq. Including the ten percent (10%) in the submitted contract price allowed Alcor to avoid paying the ten percent (10%) out of its profits; thus, Alcor caused the U.N., unknowingly, to fund the kickbacks to the government of Iraq.

43.     On information and belief, with respect to one or more of the contracts between Alcor and the Iraqi Ministry of Oil ("MoO"), the MoO asked Alcor to sign, and Alcor did in fact sign, an auxiliary contract, called a "side letter," memorializing Alcor's commitment to pay the ten percent (10%) ASSFs.

### Innospec Paid Kickbacks to Iraqi Officials to Secure Contracts to Sell and Supply TEL in Iraq under the OFFP

44.     The MoO and its component state-owned refineries are consumers of fuel additives. The MoO has purchased TEL from Innospec and Alcor.

45.     Naaman, a Lebanese/Canadian dual national, acted as the agent for Innospec and Alcor in Iraq and elsewhere beginning in at least 1995. Naaman maintained his principal offices in Abu Dhabi, United Arab Emirates. On behalf of Innospec and Alcor, Naaman negotiated contracts with the MoO to supply TEL. Naaman's activities were authorized and directed at all

times by Innospec and Alcor, through officers and executives of both Innospec and Alcor, including a Managing Director who was responsible for managing the TEL business in Iraq.

46.     Naaman, at all times relevant herein acting as agent for both Innospec and Alcor, facilitated the payment of kickbacks to and for the benefit of Iraqi officials.

47.     From 2001 through 2004, Innospec, through Alcor, entered into at least five OFFP contracts to supply TEL to MoO refineries, from which it earned revenues of approximately $45,804,915 and profits of approximately $23,125,820.

48.     To obtain these contracts, Alcor paid or promised to pay at least $4 million in kickbacks to Iraqi officials.

49.     Each of the OFFP contracts was negotiated by Naaman on behalf of Innospec and Alcor, and included an agreement that Innospec and/or Alcor would pay kickbacks to Iraqi officials in exchange for the contract being awarded.

50.     Innospec and Alcor agreed to pay kickbacks and caused kickbacks to be paid to Iraqi officials in exchange for contracts awarded to Innospec and Alcor by the government of Iraq pursuant to OFFP.

51.     The primary purpose of Innospec and Alcor paying and promising payment of kickbacks to Iraqi officials was to obtain and maintain lucrative TEL sales with the government of Iraq.

52.     On information and belief, the kickbacks were paid by Naaman, who was then reimbursed by Innospec and/or Alcor.  Naaman submitted false invoices to Innospec for reimbursement.  These invoices purported to be for technical support and security operations, but in truth were for payments Naaman had made to Iraqi officials.  Innospec knew the purpose of these payments, and reimbursed to Naaman the amounts requested by the false invoices.

53.     On their accounting books and records, Innospec and Alcor mischaracterized all of the kickbacks paid to Iraqi officials in exchange for OFFP contracts as "after sales service fees," and/or legitimate commission payments based on false invoices from Naaman.

54.     Alcor submitted contracts to the U.N. which failed to disclose and concealed the fact that the prices of the contracts had been inflated by ten percent (10%) in order to generate the money that was used to pay kickbacks to Iraqi officials.

55.     Alcor caused the transmission of international wire communications to and from the United States to give notice to the U.N. that goods had been shipped to, and inspected in, Iraq and to give notice to Innospec's bank in Switzerland that the U.N. was authorizing payments pursuant to the contracts.

**Innospec Bribed Iraqi Officials to Facilitate Execution of a Long Term
Purchase Agreement with Iraq Subsequent to the End of OFFP**

56.     After the OFFP ended, in or around October 2004, Alcor entered into a three-year long-term purchase agreement valued at more than $15 million to supply TEL to MoO refineries.

57.     This long term purchase agreement was performed pursuant to six purchase orders dated February 2005 through December 2007.

58.     On at least three shipments under that agreement, Innospec and Alcor routed a payment of approximately two percent (2%) of the total shipment value to Naaman for him to pass on to Iraqi officials.  On some occasions, Naaman provided Innospec false invoices to support the payments, which were paid by Innospec.

59.     Through at least 2008, Innospec and Alcor, through Naaman, continued to pay kickbacks and bribes to Iraqi officials as part of the ordinary course of the business of selling and supplying TEL to the MoO.  Innospec continued to reimburse Naaman for these payments, with full knowledge of their purpose.

12

60.     On their accounting books and records, Innospec and Alcor mischaracterized the bribes paid to Iraqi officials as "commissions" and "sales promotion expenditures," in some cases based on false invoices from Naaman.

61.     From 2004 to 2008, Innospec and Alcor paid or promised to pay approximately $1,736,387 in bribes to Iraqi officials.  Innospec and Alcor earned more than $30,647,788 in profits on those contracts.

62.     From 2001 to 2008, Innospec and Alcor paid or promised to pay in excess of $5.8 million in bribes and kickbacks to Iraqi officials to secure contracts to sell and supply TEL to the MoO.  Innospec and Alcor earned more than $50 million in profits on those contracts.  The TEL contracts that Innospec and Alcor obtained during that period resulted in the exclusion of Plaintiffs and the loss of *mmt*® sales by Plaintiffs.

63.     Innospec has admitted that a number of its senior executives, including its then-Chief Executive Officer, were aware of and approved the payment of these bribes and kickbacks.

### Innospec Bribed Iraqi Officials to Ensure Failure of a 2006 Trial Test of *mmt*® and to Facilitate Execution of a Second Long-Term Purchase Agreement with Iraq

64.     Starting in approximately 2001, the government of Iraq expressed interest in transitioning from TEL to *mmt*®.  In or around 2002, a delegation of Iraqi officials traveled to Amman, Jordan to meet with representatives of Afton at the Jordan Petroleum Refining Company to conduct technical demonstrations and reviews of *mmt*®.  Based on the results of those tests, the MoO published a tender for 2000 metric tons of *mmt*® for use at its three state-owned refineries.  The tender was interrupted by the U.S. invasion of Iraq and subsequent war.

65.     Beginning in at least July 2003, Afton renewed its efforts to sell and supply *mmt*® in Iraq, and by at least August 2003, Iraqi officials and representatives of Afton had discussed the sale and supply of *mmt*® to Iraq for use by state-owned refineries.

66.    In connection with these discussions, Afton agreed to manufacture and supply injection equipment to the Iraqi refineries. In or around November 2003, Afton began building the injection equipment to meet the requirements of each of the three state-owned refineries, Daura, Basra and Baiji.

67.    In or around August 2004, the injection equipment was shipped to Afton's facility in Dordrecht, The Netherlands.

68.    In or around November 2005, representatives of the MoO and the state-owned refineries traveled to Afton's facility in Dordrecht, The Netherlands for training to operate the injection equipment.

69.    In or around November 2005, following the training program, the injection equipment was shipped to Jordan for delivery to Iraq, along with three ISO storage tanks and related equipment.

70.    Upon information and belief, the injection equipment was installed in at least the Daura refinery in Iraq.

71.    In or around January 2006, Afton sold and supplied 60 metric tons of *mmt*® to the MoO for field testing at the Daura refinery in Iraq.

72.    On or around September 13, 2006, the MoO conducted a field trial test of *mmt*® to determine its suitability for the MoO's refining needs. Upon successful completion of the field trial test, the MoO planned to place an order with Afton for at least 350 metric tons of *mmt*®.

73.    On or around September 13, 2006, Naaman reported to Innospec, through an email to a senior executive and division managing director of Innospec, that the MoO was conducting a field trial test of *mmt*® to determine if it was a viable alternative to TEL, and that if

14

*mmt®* passed the test, the MoO would purchase 350 metric tons of *mmt®*, reducing the amount of TEL the MoO would purchase from Innospec.

74.    On or around September 13, 2006, Naaman sent an email to Innospec stating: "My advise [*sic*] is to follow my plan on the testing of the MMT [*sic*] . . . and to move forward immediately on the implementation to make the test fail, so there will be no more MMT order [*sic*]."

75.    Innospec was concerned that if the *mmt®* test was successful it would cause Iraq to purchase substantial amounts of *mmt®* for its state-owned refineries and lead to a corresponding decrease in demand for TEL.

76.    Faced with this competitive threat and the impending loss of sales volume and profits from TEL sales, Innospec, through Naaman, bribed Iraqi officials to ensure that *mmt®* would fail the field trial test, irrespective of its competitive merits or suitability for Iraq's refining needs.

77.    Per the authorization of its senior executive, Innospec, through Naaman, paid a total of approximately $155,000 to Iraqi officials to ensure that *mmt®* did not pass the MoO's field trial test. Innospec reimbursed Naaman for these payments, with full knowledge of their purpose.

78.    On or around September 16, 2006, under instructions from the senior executive, Naaman submitted a false invoice in the amount of $105,000 to Innospec for reimbursement. This invoice purported to be for "technical support and security operations required to nurture and protect the ongoing TEL sales in Iraq," but in truth was for payments Naaman had made to Iraqi officials to ensure that *mmt®* failed the MoO's field trial test. Innospec knew the purpose

15

of these payments, and reimbursed to Naaman the amounts requested by the false invoice with the approval of the senior executive.

79.     On or around September 18, 2006, Innospec, through a division managing director, approved the false invoice for payment by Innospec, through Alcor, with the note, "Best to allocate to agents [*sic*] commissions."

80.     On or around February 28, 2007, Naaman sent a letter to Innospec enclosing an English translation of a report on the field trial test of *mmt®*, stating that *mmt®* had failed the field trial test, and noting his success in making sure that the *mmt®* test failed "against all odds." Naaman wrote that in order to ensure that *mmt®* failed the MoO's field trial test, Naaman "had to pay an additional fee to make sure that the report will come to our advantage." Naaman requested an "additional $50,000/ - cost incurred."

81.     On or around February 28, 2007, Naaman submitted a false invoice in the amount of $50,000 to Innospec for reimbursement. This invoice purported to be for "training of Daura Refinery blending unit team in Jordan," but in truth was for additional payments Naaman had made to Iraqi officials to ensure that *mmt®* failed the MoO's field trial test. Innospec knew the purpose of these payments, and reimbursed to Naaman the amounts requested by the false invoice.

82.     In or around September 2006 to in or around April 2007, Innospec paid a total of approximately $155,000 to Iraqi officials to ensure that *mmt®* did not pass the MoO's field trial test.

83.     Aside from paying $155,000 up front to ensure that the *mmt®* test failed, Innospec, through Naaman, also paid or promised to pay additional bribes to Iraqi officials in connection with future TEL contracts.

84.     As a direct and intended consequence of Innospec's payments to Iraqi officials, the results of the MoO's field trial test were tampered with, *mmt*® failed the field trial test and was deemed unsuitable, Plaintiffs were not awarded a contract to supply *mmt*® to Iraq in 2006, no *mmt*® was purchased at that time, and Innospec continued to supply TEL to Iraq.

85.     Innospec's efforts to sabotage Iraq's use of *mmt*® were successful and in or around January 2008 Innospec executed a second long term purchase agreement to supply TEL to MoO refineries.  That agreement took effect in June 2008.

86.     On or around January 29, 2009, the MoO opened a letter of credit in favor of Alcor for $17 million.

**Innospec Made Other Illicit Payments to Iraqi Officials for Its Own Benefit**

87.     Innospec and Alcor agreed to pay and promised to pay additional bribes, including but not limited to money, travel, gifts and entertainment, to Iraqi officials to obtain and maintain contracts to supply TEL and to secure other benefits for Innospec and Alcor, all of which resulted in the exclusion of Plaintiffs and *mmt*®.

88.     On information and belief, on several occasions between at least 2002 and 2008, Innospec and Alcor offered and paid for travel expenses for Iraqi officials, including providing them with thousands of dollars in "pocket money" during the trips and taking them shopping during their travel.

89.     On information and belief, in or around August 2006, Innospec paid for the costs of an Iraqi official's vacation with his wife in Thailand, including $5,000 in "pocket money," in exchange for his assistance on Innospec's behalf in arbitration against NewMarket in the United Kingdom.  The total cost of the trip was approximately $13,076.

17

90.     On information and belief, in 2008, Alcor paid for the costs of three Iraqi officials' travel to Beirut, Lebanon, for a half-day meeting to sign the 2008 long term production agreement, including hotel accommodations, entertainment, meals, phone cards, cameras and $5,000 per official in "pocket money." The total cost of the trip was $34,480.

91.     From 2001 to 2008, Innospec and Alcor paid, or promised to pay, in excess of $5,800,000 in kickbacks to the government of Iraq and bribes to Iraqi officials to secure TEL supply contracts, which resulted in the exclusion of Plaintiffs and *mmt*®. Innospec earned more than $50,000,000 in profits on those contracts.

### Innospec Bribed Indonesian Officials to Secure TEL Supply Contracts and Prevent a Switch to an Unleaded Standard that Would Have Foreclosed Further TEL Sales in Indonesia

92.     Innospec, through its agents in Indonesia, also paid bribes to Indonesian officials in order to win contracts for the sale and supply of TEL to state-owned refineries in Indonesia.

93.     Migas is the Indonesian Directorate General of Oil and Gas. BP Migas and BPH Migas are the Indonesian regulatory agencies that oversee fuel supplies and refining operations.

94.     Pertamina, the state-owned national oil and gasoline company in Indonesia, is a consumer of fuel additives and has purchased TEL from Innospec.

95.     PTSI acted as the principal agent of Innospec in Indonesia beginning in at least 1982. The principal of PTSI was Willy Sebastian ("Sebastian"). He was assisted by Mohamed Syakir ("Syakir"). PTSI, Sebastian and Syakir were engaged by Innospec in order to conduct business in Indonesia. The activities of PTSI, Sebastian and Syakir were authorized and directed at all times by Innospec, through Innospec executives who were responsible for managing the TEL business in Indonesia.

96.    PTSI, Sebastian and Syakir, at all times relevant herein acting as agents for both

Innospec and Alcor, facilitated the payment of bribes to and for the benefit of Indonesian

officials.

97.    At least as early as 1999, Innospec began to obtain contracts in Indonesia, and has

conducted substantial business there over time.

98.    From approximately 2000 to 2006, the government of Indonesia was considering

transitioning to unleaded gasoline, which does not require TEL.  The effect of this would have

been to end TEL sales in Indonesia.

99.    Starting in approximately 2000, the government of Indonesia expressed interest in

transitioning from TEL to *mmt®*.  On or around April 12, 2000, representatives of Afton made a

presentation about *mmt®* at Migas.

100.    In or around October 2000, a delegation of Indonesian officials, including

representatives of Pertamina and Migas, traveled to Richmond, Virginia to meet with

representatives of Afton.  During this visit, the Indonesian officials confirmed their interest in

transitioning from TEL to *mmt®*.

101.    After their meeting with representatives of Afton, the delegation of Indonesian

officials traveled to the United Kingdom to meet with representatives of Innospec.

102.    Notes taken during a meeting in December 2000 between Innospec and the

Directorate General of Oil and Gas (Migas) at the Ministry of Energy and Mineral Resources

state: "Migas and Pertamina are coming under increasing pressure from the local EPA to

introduce MMT [*sic*] before lead phase out is complete."

103.    Faced with this competitive threat and the impending loss of sales volume and

profits, from approximately 2000 until 2006, Innospec, through its local agents, paid bribes to

Indonesian officials, including from Pertamina and BP Migas, to induce the purchase of higher levels of TEL than Indonesia required and to cause the government of Indonesia not to switch to unleaded gasoline, thereby extending the life of TEL sales in Indonesia.

104.    In or around 2003, Pertamina ordered small amounts of *mmt*® in connection with laboratory tests conducted at the Cilicap refinery.

105.    On or around June 23, 2003, Migas sent a letter to the Indonesian Ministry of Environment ("MoE") seeking approval to use *mmt*® in Indonesia, and citing in support of its request the report of the 2003 risk assessment study, "The Risk of Manganese Exposure from Health Aspect in Indonesia," conducted by the University of Padjadjaran ("UNPAD") in Bandung, Indonesia, in consultation with MoE staff. The UNPAD report recommended that *mmt*® could be used as alternative octane booster replacing TEL in Indonesia.

106.    On or around February 6, 2004, Pertamina issued an economic evaluation report (based on the conditions at Pertamina's Cilicap refinery) confirming the cost savings of using *mmt*® as opposed to other non-lead based fuel additives (octane boosters).

107.    On or around November 1, 2004, Pertamina ordered 22 metric tons of *mmt*® from Afton, which was shipped to the Cilicap refinery in or around December 2004 for trial tests. Upon successful completion of the trial tests, Pertamina planned to order additional *mmt*® from Afton. This would have reduced the amount of TEL that Indonesia would have purchased from Innospec.

108.    In or around December 2004, Sebastian reported to Innospec, through an email to Innospec executives, that Pertamina was planning to stop using TEL and that the Cilicap refinery would be using *mmt*®.

109.    In or around December 2004, Sebastian sent an email to Innospec stating: "In mid December, I was assisted by [officials at] Migas to create a new strategy which is to forward a letter directly to the Director of Pertamina informing two important things. Firstly, TEL has to be continually used and secondly, Pertamina requires a formal recommendation from Migas and other related departments (e.g. ministry of finance and environment) for the usage of Octane Booster . . . ."

110.    In or around January 2005, Pertamina conducted trial tests of *mmt®* at the Cilicap refinery. On information and belief, the trial tests of *mmt®* were successful.

111.    On or around January 28, 2005, the MoE issued a letter in response to Migas' letter of June 23, 2003, objecting to the use of *mmt®* in Indonesia on the basis of precautionary principle. On information and belief, this objection was lodged at the request of Innospec and as a result of the payment of a bribe.

112.    On or around July 18, 2006, Pertamina sent a letter to Afton's agent in Indonesia requesting that Afton make a presentation on *mmt®* in connection with Pertamina's upcoming tender. Pertamina intended to publish a tender in or around September 2006 for a non-lead based fuel additive to raise the level of octane during the production of unleaded gasoline at three of its state-owned refineries, Plaju, Dumai and Balkipapan.

113.    On or around July 27, 2006, representatives of Afton made a presentation to Pertamina about *mmt®* and its use by the state-owned refineries.

114.    On or around August 3, 2006, Migas sent a letter to the MoE seeking a determination of which types of non-lead based fuel additives (octane boosters) were permitted for use in Indonesia.

115.    On or around October 3, 2006, the MoE sent a letter to Pertamina requesting additional information about Pertamina's use of non-lead based fuel additives to raise the level of octane during the production of unleaded gasoline.

116.    On or around October 19, 2006, Pertamina responded to the MoE's letter of October 3, 2006, expressing its interest in reducing its dependence on the import of expensive High Octane Mogas Component ("HOMC") to raise the level of octane during the production of unleaded gasoline at its state-owned refineries, and further requesting an opportunity to make a presentation to the MoE about non-lead based fuel additive (octane booster) options.

117.    On information and belief, on or around November 17, 2006, Pertamina made a presentation to the MoE recommending the use of *mmt*® in Indonesia.

118.    On information and belief, in November 2006, representatives of Innospec met secretly with the MoE.

119.    On or around November 20, 2006, MoE issued a letter endorsing the use of ferrocene, the non-lead based fuel additive (octane booster) manufactured by Innospec. On information and belief, this endorsement was issued at the request of Innospec and as a result of the payment of a bribe.

120.    On or around November 22, 2006, an Innospec executive sent an email to another Innospec executive stating: "As you are aware, Indonesia was planning to go lead free in 2000 under the now defunct "Blue Sky" programme, this obviously did not happen for a number of reasons and since 1st January 2000 until the present, we have supplied 28,390 [metric tons] of TEL to Pertamina generating $277 million in revenue."

121.    As a direct and intended consequence of Innospec's payments to Indonesian officials, no additional *mmt*® was purchased by Pertamina for use by state-owned refineries.

122.    On information and belief, efforts by Innospec to bribe and otherwise improperly influence Indonesian officials to continue purchasing TEL continued through the end of 2006.

123.    Innospec has admitted that a number of its senior executives, including its then-Chief Executive Officer, were aware of and approved the bribe payments.

124.    Innospec, through its local agents, paid and agreed to make payments to Indonesian officials to secure bulk orders for TEL supply, facilitate payments to key individuals who could influence TEL purchases, block legislative efforts to ban or enforce a ban on TEL, and help achieve Innospec's short and long term marketing objectives. Innospec's actions prolonged the use of leaded fuel in Indonesia.

125.    On information and belief, the bribes were paid by PTSI, which was then reimbursed by Innospec. PTSI submitted false invoices to Innospec for reimbursement. These invoices purported to be for travel and other expenses, but in truth were for payments PTSI had made to Indonesian officials. Innospec knew the purpose of these payments, and reimbursed to PTSI the amounts requested by the false invoices.

126.    From 2000 to 2006, Innospec paid or promised payment of approximately $2,883,507 to Indonesian officials at BP Migas and Pertamina to secure TEL supply contracts, which resulted in the exclusion of Plaintiffs and *mmt*®. Innospec earned approximately $21,506,610 in profits on those contracts.

127.    As a direct result of Innospec and Alcor's aforementioned anticompetitive and illegal conduct, Plaintiffs have been injured in their business and property in an amount not yet determined, including, but not limited, to loss of revenue, loss of profits, destruction of their business, reduction or destruction of their competitive position in the market, and damage to their reputation.

## U.S. and U.K. Government Investigations into Innospec

128.    In or around February 2006, the SEC initiated a non-public investigation of Innospec and Alcor regarding their financial reporting and possible violations of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 *et seq.*, and other laws in connection with Innospec's involvement with the OFFP.

129.    In or around December 2006, DOJ opened a non-public investigation into Innospec and Alcor's misconduct under the OFFP and identified evidence of additional bribery conduct.

130.    In or around May 2008, the SFO opened a non-public investigation into Innospec and Alcor's misconduct under the OFFP, and in or around July 2008 opened a separate investigation into additional bribery conduct.

131.    The SEC, DOJ and the SFO coordinated their investigations.

132.    In the course of these investigations, evidence was uncovered and identified relating to payment of kickbacks to Iraqi officials under the OFFP, bribery of Iraqi officials subsequent to the end of the OFFP, and bribery of Indonesian officials relating to the sale of TEL.

133.    On March 18, 2010, Innospec pleaded guilty to a twelve-count indictment filed in the U.S. District Court for the District of Columbia for charges relating to kickbacks and bribes paid to Iraqi officials in connection with OFFP and post-OFFP contracts—all in order to obtain and maintain lucrative TEL sales, and to ensure that the government of Iraq favored TEL over *mmt®*.

134.    In connection with those charges, Innospec admitted, agreed and stipulated to the information and allegations contained in the Plea Agreement and criminal Information filed in

the U.S. District Court for the District of Columbia, copies of which are attached as Exhibits A and B, respectively, and incorporated herein by reference.

135.    On March 18, 2010, Innospec pleaded guilty in the U.K.'s Southwark Crown Court to charges of bribing Indonesian officials in order obtain and maintain lucrative TEL sales, and to ensure that the government of Indonesia favored TEL over *mmt®*.

136.    In connection with those charges, Innospec admitted, agreed and stipulated to the information and allegations contained in the Opening Statement filed in the U.K.'s Southwark Crown Court, a copy of which is attached as Exhibit D and incorporated herein by reference.

137.    On March 18, 2010, Innospec entered into a settlement agreement with the SEC to resolve charges relating to payments made to Iraqi and Indonesian officials—all in order to obtain and maintain lucrative TEL sales, and to ensure that the governments of Iraq and Indonesia favored TEL over *mmt®*—and for related record-keeping and financial reporting violations. A copy of the civil Complaint filed in the U.S. District Court for the District of Columbia is attached as Exhibit C and incorporated herein by reference.

138.    Throughout the relevant period, Innospec and Alcor affirmatively and fraudulently concealed their unlawful conduct. In fact, Innospec and Alcor initially denied culpability during the course of the DOJ investigation and did not begin cooperating with DOJ until after the investigation had continued for more than a year.

139.    Plaintiffs did not discover, nor could they have discovered through reasonable diligence, that Innospec and Alcor were violating federal and state laws until shortly before filing this Complaint because Innospec and Alcor used deception and secret methods to avoid detection and to affirmatively conceal their violations. Innospec and Alcor did not tell Plaintiffs that they were paying and promising to pay illegal bribes and kickbacks to Iraqi and Indonesian officials,

and Plaintiffs had no reason to suspect that Innospec and Alcor were engaging in such unlawful

conduct in order to foreclose competition.  Plaintiffs could not have discovered the violations

alleged herein because Innospec and Alcor conducted their illegal activities secretly, concealed

the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed

their activities through various other means and methods designed to avoid detection.

140.    In fact, Plaintiffs did not learn of the violations alleged herein until on or around

March 18, 2010, when Innospec's civil settlement and guilty pleas came to light.

141.    Innospec and Alcor engaged in a successful and unlawful bribery scheme, which

they affirmatively concealed, at least in the following respects:

a.  By agreeing internally and with their agents at meetings and in
communications not to discuss publicly, or otherwise reveal, the nature and
substance of the acts and communications in furtherance of the illegal scheme;

b.  By mischaracterizing all the illegal bribes and kickbacks paid to Iraqi and
Indonesian officials as legitimate "commissions," "sales promotion
expenditures" and other business expenses in Innospec and Alcor's
accounting books and records;

c.  By requesting that Innospec and Alcor's agents submit false invoices in
connection with the bribes and kickbacks paid to Iraqi and Indonesian
officials—including for "technical support and security operations," "training"
and "remuneration for after sales services"—and by authorizing the fictitious
language that Innospec and Alcor's agents were requested to include in the
invoices that were submitted for payment—including "the fewer words the
better!" and "payment for airfares for trip . . . for business discussions";

d. By submitting false information in connection with Innospec and Alcor's year-end financial statements filed with the SEC;

e. By intentionally creating the false appearance of competition by secretly bribing Iraqi officials to rig the field trial test of *mmt®* so that it would appear that *mmt®* was not as suitable for use by state-owned refineries as TEL; and

f. By intentionally creating the false appearance of competition by secretly bribing Indonesian officials to cancel an order for *mmt®* and to refrain from purchasing *mmt®* so that it would appear that *mmt®* was not as suitable for use by state-owned refineries as TEL.

142.    Innospec and Alcor conducted their illegal activities secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, did not discuss publicly or otherwise reveal the nature and substance of their unlawful acts and communications in furtherance of their illegal scheme, mischaracterized all of the bribes and kickbacks paid to Iraqi and Indonesian officials as legitimate payments, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

143.    As a result of Innospec and Alcor's fraudulent concealment, all applicable statutes of limitation affecting Plaintiffs' claims have been tolled.

## COUNT I

### Unlawful Commercial Bribery in Violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c)

144.    Plaintiffs reassert and reallege the allegations set forth in paragraphs 1 through 143, as though fully set forth herein.

145.    Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), provides that:

> It shall be unlawful for any person engaged in commerce, in the
> course of such commerce, to pay or grant, or to receive or accept,
> anything of value as a commission, brokerage, or other
> compensation, or any allowance or discount in lieu thereof, except
> for services rendered in connection with the sale or purchase of
> goods, wares, or merchandise, either to the other party to such
> transaction or to an agent, representative, or other intermediary
> therein where such intermediary is acting in fact for or in behalf, or
> is subject to the direct or indirect control, of any party to such
> transaction other than the person by whom such compensation is so
> granted or paid.

146.    Innospec and Alcor engage and have engaged in commerce, as contemplated by

Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), by selling and offering to sell TEL

globally, including in Iraq and Indonesia.  Innospec, a U.S. corporation incorporated in

Delaware, has been using illegal payments to Iraqi officials to prevent and exclude the sale by

Plaintiffs, both U.S. corporations, of a product made in the United States.  Innospec and Alcor

also have entered into several marketing and sales agreements with NewMarket and its

subsidiaries relating to the sale and supply of TEL, have sold and supplied TEL inside and

outside the United States, and have derived substantial revenue from those sales.

147.    Innospec and Alcor, through their officers, employees and agents, have made

undisclosed and illegal payments to Iraqi officials for the purpose of obtaining and maintaining

contracts for the sale and supply of TEL to refineries in Iraq.  Innospec and Alcor also have

made undisclosed and illegal payments to Iraqi officials for the intended purpose of rigging the

results of the MoO's field trial test for *mmt*® to ensure that *mmt*® would fail the test and the

MoO would purchase TEL from Innospec instead of purchasing *mmt*® from Afton.

148.   Innospec, through its officers, employees and agents, has made undisclosed and illegal payments to Indonesian officials for the purpose of obtaining and maintaining contracts for the sale and supply of TEL to refineries in Indonesia.

149.   These payments were not made for any services rendered in connection with the sale or purchase of TEL, and Iraqi and Indonesian officials did not provide any services to Innospec or Alcor in return for these payments within the contemplation of 15 U.S.C. § 13(c).

150.   By paying and promising to pay bribes and kickbacks to Iraqi and Indonesian officials in order to obtain and maintain lucrative TEL sales, to ensure that the governments of Iraq and Indonesia favored TEL over *mmt*®, and to prevent the sale and supply by Plaintiffs of *mmt*® in Iraq and Indonesia, Innospec and Alcor have engaged in commercial bribery in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

151.   The bribes and kickbacks were successful and achieved their intended effect in that Innospec and Alcor obtained and maintained lucrative TEL sales and prevented Plaintiffs' sale and supply of *mmt*® in Iraq and Indonesia.

152.   Innospec and Alcor's bribery scheme is *per se* unlawful and constitutes *per se* competitive injury.

153.   This unlawful commercial bribery has injured Plaintiffs because they have been foreclosed from opportunities to market and sell *mmt*®. Had the competitive process not been thwarted by Innospec and Alcor through their bribery scheme, Plaintiffs would have sold and supplied *mmt*® to the MoO and earned profits from the sale of *mmt*®. Innospec and Alcor's illegal conduct harmed competition by precluding all competition from *mmt*®, the most viable substitute for TEL, and caused Plaintiffs to suffer injury thereby. Furthermore, Innospec and Alcor's illegal conduct entirely foreclosed and eliminated competition from Plaintiffs.

154.    As a direct, substantial and proximate result of the foregoing unlawful conduct, Plaintiffs have suffered an antitrust injury and have been injured in their business, property, reputation and competitive position in an amount to be determined at trial.

155.    By reason of the foregoing and pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), Plaintiffs are entitled to recover treble damages and their costs of this action, including their reasonable attorneys' fees.

## COUNT II

**Unlawful Commercial Bribery in Violation of the Virginia Antitrust Act,**
**Virginia Code § 59.1-9.1 *et seq.***

156.    Plaintiffs reassert and reallege the allegations set forth in paragraphs 1 through 155, as though fully set forth herein.

157.    The Virginia Antitrust Act, Virginia Code § 59.1-9.7(c), provides that:

> It is unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for and not exceeding the actual cost of such services rendered in connection with the sale or purchase of goods, wares or merchandise.

158.    Innospec and Alcor engage and have engaged in commerce, as contemplated by the Virginia Antitrust Act, Virginia Code § 59.1-9.3, by selling and offering to sell TEL globally, including in Iraq and Indonesia.  Innospec, a U.S. corporation incorporated in Delaware has been using illegal payments to Iraqi officials to prevent and exclude the sale by Plaintiffs, both U.S. corporations, of a product made in the United States.  Innospec and Alcor also have entered into several marketing and sales agreements with NewMarket and its subsidiaries relating to the sale and supply of TEL, have sold and supplied TEL inside and outside the United States, and have derived substantial revenue from those sales.

159.     Innospec and Alcor, through their officers, employees and agents, have made undisclosed and illegal payments to Iraqi officials for the purpose of obtaining and maintaining contracts for the sale and supply of TEL to refineries in Iraq.  Innospec and Alcor also have made undisclosed and illegal payments to Iraqi officials for the intended purpose of rigging the results of the MoO's field trial test for *mmt*® to ensure that *mmt*® would fail the test and the MoO would purchase TEL from Innospec and Alcor instead of purchasing *mmt*® from Plaintiffs.

160.     Innospec, through its officers, employees and agents, has made undisclosed and illegal payments to Indonesian officials for the purpose of obtaining and maintaining contracts for the sale and supply of TEL to refineries in Indonesia.

161.     These payments were not made for any services rendered in connection with the sale or purchase of TEL, and Iraqi and Indonesian officials did not provide any services to Innospec and Alcor in return for these payments within the contemplation of the Virginia Antitrust Act, Virginia Code § 59.1-9.7(c).

162.     By paying and promising to pay bribes and kickbacks to Iraqi and Indonesian officials in order to obtain and maintain lucrative TEL sales, to ensure that the governments of Iraq and Indonesia favored TEL over *mmt*®, and to prevent Plaintiffs' sale and supply of *mmt*® in Iraq and Indonesia, Innospec and Alcor have engaged in commercial bribery in violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.7(c).

163.     The bribes and kickbacks were successful and achieved their intended effect in that Innospec and Alcor obtained and maintained lucrative TEL sales and prevented Plaintiffs' sale and supply of *mmt*® in Iraq and Indonesia.

164.     Innospec and Alcor's bribery scheme is *per se* unlawful and constitutes *per se* competitive injury.

31

165. This unlawful commercial bribery has injured Plaintiffs because they have been foreclosed from opportunities to market and sell *mmt*®. Had the competitive process not been thwarted by Innospec and Alcor through their bribery scheme, Plaintiffs would have sold and supplied *mmt*® to the MoO and earned profits from the sale of *mmt*®. Innospec and Alcor's illegal conduct harmed competition by precluding all competition from *mmt*®, the most viable substitute for TEL, and caused Plaintiffs to suffer injury thereby. Furthermore, Innospec and Alcor's illegal conduct entirely foreclosed and eliminated competition from Plaintiffs.

166. As a direct, substantial and proximate result of the foregoing unlawful conduct, Plaintiffs have suffered an antitrust injury and have been injured in their business, property, reputation and competitive position in an amount to be determined at trial.

167. By reason of the foregoing, Plaintiffs are entitled to recover treble damages and their costs of this action, including their reasonable attorneys' fees. Virginia Code § 59.1-9.12(b).

## COUNT III

### Unlawful Conspiracy to Injure Another in its Trade or Business in Violation of the Virginia Business Conspiracy Act, Virginia Code § 18.2-499

168. Plaintiffs reassert and reallege the allegations set forth in paragraphs 1 through 167, as though fully set forth herein.

169. The Virginia Business Conspiracy Act, Virginia Code § 18.2-499, makes it unlawful for a person to combine, associate, agree or mutually undertake with another, or to attempt to procure the participation, cooperation, agreement or assistance of another person, for the purpose of "willfully and maliciously injuring another in his reputation, trade or business" or for the purpose of "willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."

170.   Through the actions described above, Innospec and Alcor, through their officers, employees and agents, have attempted to procure the participation, cooperation, agreement and assistance of Iraqi and Indonesian officials, and have combined, associated, agreed, mutually undertaken and acted in concert with those Iraqi and Indonesian officials, for the purpose of willfully, maliciously and unlawfully injuring Plaintiffs in their reputation, trade or business. Specifically, as detailed above, Innospec and Alcor have paid and promised to pay bribes and kickbacks to Iraqi and Indonesian officials in order to obtain and maintain lucrative TEL sales, to ensure that the governments of Iraq and Indonesia favored TEL over *mmt*®, and to prevent the Plaintiffs' sale and supply of *mmt*® in Iraq and Indonesia.

171.   At all relevant times, Innospec and Alcor acted with legal malice, which is clearly evidenced by their commercial bribery of Iraqi and Indonesian officials with the express aim of obtaining and maintaining lucrative TEL sales and excluding Plaintiffs and *mmt*®.

172.   By conspiring to injure Plaintiffs in their trade and business, Innospec and Alcor have violated the Virginia Business Conspiracy Act, Virginia Code § 18.2-499.  Innospec and Alcor's bribes and kickbacks were successful and achieved their intended effect in that Innospec and Alcor obtained and maintained lucrative TEL sales and prevented Plaintiffs' sale and supply of *mmt*® in Iraq and Indonesia.

173.   This unlawful conspiracy to injure Plaintiffs in their trade and business has deprived Plaintiffs of the ability to sell and supply *mmt*® in Iraq and Indonesia and caused Plaintiffs to suffer injury thereby.

174.   As a direct, substantial and proximate result of the foregoing unlawful conduct, Plaintiffs have been injured in their business, property, reputation and competitive position in the sale and supply of fuel additives in an amount to be determined at trial.

175.   By reason of the foregoing, Plaintiffs are entitled to recover treble damages and their costs of this action, including their reasonable attorneys' fees.  Virginia Code § 18.2-500.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court order, adjudge and decree:

A.   That Innospec and Alcor's above-described acts constitute violations of the Robinson-Patman Act, 15 U.S.C. § 13(c), the Virginia Antitrust Act, Virginia Code § 59.1-9.7(c), and the Virginia Business Conspiracy Act, Virginia Code § 18.2-499.

B.   That Plaintiffs receive judgment against Innospec and Alcor in an amount to be determined at trial, together with an award of pre-judgment and post-judgment interest;

C.   That all damages Plaintiffs have sustained as a result of Innospec and Alcor's violations of law be trebled;

D.   That Innospec and Alcor be required to pay to Plaintiffs all reasonable attorneys' fees, expenses and costs incurred by Plaintiffs in this action; and

E.   That Plaintiffs be granted such additional relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs respectfully request a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), on all matters so triable.

Dated: _7/23/10_

Respectfully Submitted,

**NEWMARKET CORPORATION and
AFTON CHEMICAL CORPORATION**
By Counsel

Howard Feller (VSB#18248)
Robert M. Tyler (VSB#37861)
Anne Marie Cushmac (VSB#38312)
Alexander J. Brackett (VSB#67981)
Matthew D. Fender (VSB#76717)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1000
(804) 775-1061 (facsimile)
*Counsel for NewMarket Corporation
        and Afton Chemical Corporation*