IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NEWMARKET CORP., and )
AFTON CHEMICAL CORP. )
)
Plaintiffs, )
)
v. ) Civil Action No. 3:10CV503–HEH
)
INNOSPEC, INC., and )
ALCOR CHEMIE VERTRIEBS GmbH, )
)
Defendants. )

## MEMORANDUM OPINION
(Defendants' Motion to Dismiss)

This is an action for money damages brought by NewMarket Corporation and Afton Chemical Corporation (collectively referred to as "Plaintiffs") against Innospec, Incorporated and Alcor Chemie Vertriebs GmbH (collectively referred to as "Defendants") for alleged violations of the Sherman Act, the Robinson-Patman Act, the Virginia Antitrust Act, and the Virginia Business Conspiracy Act. This matter is now before the Court on Defendants' motion to dismiss counts two through five of the second amended complaint, pursuant to Fed. R. Civ. P. 12(b)(6).[1] The parties have submitted detailed memoranda of law in support their respective positions. The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials presently before the Court and argument would not aid in the decisional

---

[1] Defendants originally moved to dismiss count one, which alleges a violation of the Sherman Act. However, Defendants have since withdrawn their motion as to count one. (Defs.' Reply Mem. Supp. Mot. Dismiss Am. Compl. 1-2, ECF No. 34).

process. For the reasons stated herein, Defendants' motion will be granted in part and denied in part.

I.

In their second amended complaint ("complaint"), Plaintiffs allege that Defendants violated the Sherman Act, the Robinson-Patman Act, the Virginia Antitrust Act, and the Virginia Business Conspiracy Act by paying bribes and kickbacks to government officials in Iraq and Indonesia to ensure the continuing use of a fuel additive made by Defendants, to the detriment of Plaintiffs and their competing additive. Plaintiffs are NewMarket Corporation, a Virginia corporation with various subsidiaries, and Afton Chemical Corporation, a Delaware corporation that is a wholly owned subsidiary of NewMarket. Defendants are Innospec, Incorporated, a Delaware corporation, and its wholly owned Swiss subsidiary, Alcor Chemie Vertriebs GmbH.

Both Plaintiffs and Defendants produce and sell chemical fuel additives that are designed to boost octane and enhance the performance of gasoline. Plaintiffs produce and export an additive named methylcyclopentadienyl manganese tricarbonyl ("MMT") while Defendants produce and export tetraethyl lead ("TEL"), a competing product.[2] Plaintiffs claim that Defendants paid bribes and promised kickbacks to Iraqi and Indonesian government officials to ensure the continued sale of TEL, thereby foreclosing Plaintiffs from competing in those markets and harming their potential sales and business reputations. These alleged bribes and kickbacks are claimed to have helped Defendants achieve, maintain, and exploit their monopoly of octane-boosting fuel additives and

---

[2] TEL is added to leaded gasoline, while MMT is used with unleaded gasoline.

2

foreclosed Plaintiffs and other competitors from selling fuel additives in Iraq and Indonesia. It is further alleged that Defendants conspired with Iraqi and Indonesian officials and other known and unknown individuals to commit the claimed violations.

Some of the alleged bribes paid to the Iraqi officials were purportedly carried out by Innospec's agent in Iraq, Ousama M. Naaman. According to the complaint, Naaman paid bribes directly to Iraqi officials on multiple occasions and was later reimbursed by Innospec. These alleged bribes were paid to Iraqi officials with the intention of ensuring that the Iraqi Ministry of Oil continued to purchase TEL instead of switching to MMT.

In other instances, Defendants allegedly submitted inflated contracts to the United Nations Oil-For-Food Program ("OFFP") and used the excess money to pay kickbacks to Iraqi officials. Under the terms of the OFFP, Iraq was permitted to sell its oil on the world market in exchange for food, medicine, fuel, and other products necessary for daily life, including TEL. The proceeds from Iraqi oil sales were deposited into an escrow account administered by the United Nations in New York. Sellers of goods qualifying under the OFFP could enter into contracts with the government of Iraq. Upon approval of a contract by a United Nations committee, a letter of credit was issued by the New York branch of Banque Nationale de Paris ("BNP-Paribas") to the seller's bank stating that the seller would be paid by the OFFP pending performance of the contract and inspection of the goods. When these conditions were met, the United Nations would authorize BNP-Paribas to pay the seller. The complaint alleges that Innospec paid kickbacks to Iraqi officials on numerous occasions by submitting inflated contracts to the OFFP through October of 2004, when the program ended.

3

Even after the OFFP ended, Defendants allegedly continued to pay bribes to Iraqi officials in order to ensure continued use of TEL. Plaintiffs claim that Naaman was the primary conduit through which Defendants paid these bribes. Additionally, the complaint claims that Defendants paid additional bribes to Iraqi officials in the form of travel, gifts, entertainment, and cash. In all, the bribes and kickbacks paid to Iraqi officials are claimed to total more than $5,800,000.

The complaint also alleges that Defendants paid bribes to Indonesian officials in order to secure supply contracts for TEL and prevent Indonesia from switching to an unleaded standard that would have foreclosed further demand for TEL. Defendants carried out the alleged Indonesian bribery scheme through its local agents, who paid bribes to government officials in order to secure bulk orders of TEL and block legislative efforts to ban use of the product. According to the complaint, these bribes involved the use of bank accounts located in the United States. The alleged bribes paid to Indonesian officials totaled more than $2,800,000.

Count one of the complaint pleads violations of the Sherman Act, count two alleges violations of the Robinson-Patman Act, counts three and four state violations of the Virginia Antitrust Act, and count five alleges a violation of the Virginia Business Conspiracy Act. The complaint also incorporates a plea agreement that Defendant Innospec entered into with the United States Department of Justice, in which Innospec admitted that it bribed government officials in Iraq and Indonesia to ensure ongoing sales of TEL, and pleaded guilty to violations of the Foreign Corrupt Practices Act.

## II.

To survive a motion to dismiss, a complaint must contain sufficient factual information "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint, "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of NC v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Rule 8 of the Federal Rules of Civil Procedure provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2).

While Rule 8 does not require "detailed factual allegations," *Twombly* held that it does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964. Thus a complaint containing facts that are merely "consistent with" a defendant's liability "stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Id.* at 557, 127 S. Ct. at 1966. A complaint achieves facial plausibility when it contains sufficient allegations supporting the reasonable inference that the facts alleged support an actionable claim. *Id.* at 556, 127 S. Ct. at 1965; *see also Iqbal*, 129 S. Ct. at 1949. "[F]ormulaic recitation of the elements of a cause of action," supported by mere conclusory statements do not suffice. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965. The reviewing court, however, must assume that plaintiff's well-pleaded

factual allegations are true and determine whether those allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 129 U.S. at 1950.

## III.

Defendants first challenge count two of the complaint, which alleges unlawful commercial bribery in violation of § 2(c) of the Robinson-Patman Act. Defendants advance a multi-pronged attack on count two: initially they assert that the alleged conduct does not meet the jurisdictional requirements of § 2(c) because the conduct does not fall within the meaning of "in commerce," as required by the statute. Second, even if the conduct is found to satisfy the "in commerce" requirement, Defendants claim that § 2(c) does not extend to wholly extraterritorial commercial bribery that occurred outside of the United States.

The Court will first address Defendants' argument regarding the extraterritorial application of § 2(c) of the Robinson-Patman Act. Section 2(c) provides that

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

In support of their argument against the extraterritorial application of § 2(c), Defendants rely on the U.S. Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). In *Morrison*, the Court held that the anti-

fraud provision of the Securities Exchange Act did not apply extraterritorially to provide a cause of action against American defendants for misconduct related to securities that were traded on foreign exchanges. *Id.* at 2883. Writing for the majority, Justice Scalia reaffirmed the longstanding principle that "unless a contrary intent appears, [a statute] is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 2877–78 (citations omitted). Defendants assert that § 2(c) contains no language indicating that Congress intended it to apply extraterritorially, and therefore contend that the presumption against extraterritoriality stands unrebutted.

Plaintiffs counter by first noting that the statute defines "commerce" as "trade or commerce ... with foreign nations." 15 U.S.C. § 12(a). According to Plaintiffs, this provision evidences Congress's intent that the law apply extraterritorially. Yet in *Morrison*, the Supreme Court expressly rejected this argument. Petitioners in *Morrison* argued that Congress intended § 10(b) of the Securities and Exchange Act to apply extraterritorially because the term "interstate commerce" is defined by the statute to include "trade, commerce, transportation, or communication ... between any foreign country and any State." *Morrison*, 130 S. Ct. at 2882 (quoting 15 U.S.C. § 78c(a)(17)). In rejecting this argument, the Supreme Court stressed that "[t]he general reference to foreign commerce in the definition of 'interstate commerce' does not defeat the presumption against extraterritoriality." *Morrison*, 130 S. Ct. at 2882. Plaintiffs' argument in this regard is therefore without merit.

Alternatively, Plaintiffs contend that Congress specifically limited the scope of other sections of the Robinson-Patman Act to domestic activities only, which, in their

7

view, proves that Congress intended that other sections, like § 2(c), should apply extraterritorially. Plaintiffs essentially argue that because § 2(c) does not contain language limiting its application to within the United States, it should be applied extraterritorially. This contention is the inverse of the rule that the Court articulated in *Morrison*. The presumption is that a statute is meant to apply only within the United States unless a contrary intent appears. *Id.* at 2877. Other than including foreign commerce in the definition of interstate commerce, which is not sufficient to defeat the presumption, *id.* at 2882, the language of § 2(c) contains no intention that it is to apply extraterritorially.[3]

In accordance with the holding of *Morrison*, the Court finds that § 2(c) of the Robinson-Patman Act does not apply extraterritorially. The Court therefore need not reach Defendants' arguments regarding whether § 2(c) proscribes commercial bribery or whether the alleged conduct occurred "in commerce." The motion to dismiss count two will be granted.

Defendants next challenge counts three, four, and five, which allege violations of § 59.1-9.1 *et seq.* and §18.2-499 of the Code of Virginia, commonly referred to as the Virginia Antitrust Act and the Virginia Business Conspiracy Act, respectively. Defendants contend that these Virginia statutes do not apply extraterritorially to conduct that occurred in Iraq and Indonesia. On the other hand, Plaintiffs argue that they should

---

[3] Plaintiffs cite Representative Wright Patman's book as support for the argument that Congress intended § 2(c) to apply extraterritorially. Yet the passage cited by Plaintiffs, in which Representative Patman notes that the territorial limitation placed on § 2(a) was not placed on other sections of the Robinson-Patman Act, is precisely the argument rejected by *Morrison*. 130 S. Ct. at 2877.

8

be permitted to proceed with these claims because Defendants have caused injury within the state as a result of their tortious actions that occurred outside its boundaries.

Although not fully addressed by the parties' briefs, at issue here is the legislative jurisdiction of Virginia concerning the application of the Virginia Antitrust Act and the Virginia Business Conspiracy Act. Legislative jurisdiction "involves 'the authority of a state to make its law applicable to persons or activities.'" *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 435 (4th Cir. 1999) (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813, 113 S. Ct. 2891, 2918 (1993)). In other words, legislative jurisdiction determines the power of a state to apply its laws to a matter and "is a core concept 'to determining the extraterritorial reach of a statute.'" *Adventure Commc'ns*, 191 F.3d at 435 (quoting *Hartford Fire*, 509 U.S. at 813, 113 S. Ct. at 2918. A similar principle is adjudicative jurisdiction, which refers to "the power of a state to try a particular action in its courts." *Adventure Commc'ns*, 191 F.3d at 435 (internal quotations and citations omitted).

While these two concepts are distinct principles of law, the guidelines used to determine legislative and adjudicative jurisdiction are substantially similar. *Compare Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (requiring minimum contacts with the forum state in order to exercise adjudicative jurisdiction), *with Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101 S. Ct. 633, 640 (1981) (holding that the forum state must have a significant contact or significant aggregation of contacts creating state interests in order to exercise legislative jurisdiction). Therefore, using *Hague* as a guidepost, this Court must determine whether Defendants have

significant contact or significant aggregation of contacts with Virginia that permits the application of the two Virginia statutes to them. *Hague*, 449 U.S. at 312–13, 101 S. Ct. at 640.

In this regard, the Court finds the allegations in paragraphs 21 through 34 of the complaint to be particularly instructive. Plaintiffs allege that from 1993 through 2001, Innospec entered into at least six separate marketing and sales agreements with Ethyl[4] and its subsidiaries, and that these agreements were negotiated and entered into in Richmond, Virginia. (Second Am. Compl. ¶¶ 23–28.) The complaint further avers that between 2006 and 2009, Innospec sold Ethyl more than $24 million of TEL for resale exclusively within the United States. (*Id.* at ¶ 29.) The payment and purchase orders for these sales were initiated and created in Richmond, Virginia. (*Id.* at ¶¶ 30–31.) Additionally, representatives from Innospec traveled to Richmond, Virginia in October 2009 to meet with representatives from Afton "to review their existing business activities and discuss opportunities to expand sales between the companies." (*Id.* at ¶ 32.)

In sum, the alleged conduct demonstrates a consistent course of business transactions between Plaintiffs and Defendants in Virginia. Importantly, the transactions involve TEL, the same product involved in the events in Iraq and Indonesia. It is therefore apparent from the allegations in the complaint that Defendants engaged in a series of substantial business transactions with Plaintiffs in Virginia regarding TEL. Simultaneously, according to the complaint, Defendants paid bribes and kickbacks to

---

[4] Afton Chemical Corporation, one of the Plaintiffs, was formerly known as Ethyl Petroleum Additives, Incorporated until it changed its name in July, 2004. (Second Am. Compl. ¶ 13.)

Indonesian and Iraqi officials in order to foreclose Plaintiffs from entering those markets with a competing product, thereby affecting Plaintiffs' business activities in Virginia.[5]

This Court is therefore of the opinion that the complaint demonstrates a sufficient interest to implement the laws of the Commonwealth of Virginia. Furthermore, permitting Plaintiffs to proceed with claims based on the Virginia Antitrust Act and the Virginia Business Conspiracy Act would not be fundamentally unfair to Defendants given their significant contacts with the forum state and consistent course of business with Plaintiffs regarding the fuel additives at issue here. *See Adventure Commc'ns*, 191 F.3d at 437.

For these reasons, Defendants' motion to dismiss will be granted as to count two and denied as to counts three, four, and five. An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: May 20, 2011
Richmond, VA

---

[5] Defendants have asserted their challenge to counts three through five pursuant to Rule 12(b)(6). Accordingly, the Court assumes the allegations in the complaint to be true. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

11